No. 14-1021(L)
No. 14-1022

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

KAREN FOSTER,

      Intervenor/Plaintiff-Appellant,

and

VICKI MARSH,

      Intervenor/Plaintiff-Appellant,

v.

JOHN L. WYNNE; 1650 PARTNERS, LLC; RIVERMONT
CONSULTANTS INC., F/K/A THE RIVERMONT BANKING
CO., INC.,

      Defendant-Appellees.

## OPENING BRIEF OF APPELLANTS

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

Gary M. Bowman, Esq.
VSB No. 28866
2728 Colonial Ave., Ste. 100
Roanoke, Virginia 24015
Tel: (540) 343-1173
gary@garymbowman.com
    *Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is not required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1021        Caption: KAREN FOSTER, et al., v. JOHN WYNNE, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

KAREN FOSTER
(name of party/amicus)

who is _____ APPELLANT _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?   ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
      If yes, identify all such owners:

i

10/28/2013 SCC

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ GARY M. BOWMAN                    Date: _____28 JULY 2014_____

Counsel for: KAREN FOSTER

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____7/28/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ GARY M. BOWMAN _____                         _____7/28/2014_____
        (signature)                                            (date)

ii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1022__    Caption: VICKI MARSH, et ai., v. JOHN WYNNE, et al. _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__VICKI MARSH_____
(name of party/amicus)

_____

who is _____APPELLANT_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

iii

10/28/2013 SCC

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES  ☑ NO
       If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐ YES  ☑ NO
       If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐ YES  ☑ NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ GARY M. BOWMAN                    Date:    28 JULY 2014

Counsel for: VICKI MARSH

## CERTIFICATE OF SERVICE
*************************

I certify that on _____7/28/2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ GARY M. BOWMAN                              7/28/2014
       (signature)                                  (date)

iv

<u>TABLE OF CONTENTS</u>

Karen Foster's Corporate Disclosure Statement . . . . . . . . . i

Vicki Marsh's Corporate Disclosure Statement  . . . . . . . . iii

Table of Authorities  . . . . . . . . . . . . . . . . . . . viii

Jurisdictional Statement  . . . . . . . . . . . . . . . . . . . 1

Statement of Issues . . . . . . . . . . . . . . . . . . . . . . 1

> Foster and Marsh had four years to bring a RICO
> conspiracy claim against Wynne.  Another victim of
> Wynne's RICO conspiracy, CVLR, filed suit first, and
> the district court erroneously dismissed CVLR's case on
> the grounds that Wynne's RICO conspiracy did not meet
> RICO's continuity requirement.  Foster's and Marsh's
> four years expired *after* CVLR's case was erroneously
> dismissed *but before* this Court of Appeals reversed the
> dismissal.  Did the district court abuse its discretion
> by refusing to apply equitable tolling to their
> limitations period so they could intervene?

Statement of the Case . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Facts Recited in CVLR's First Amended Complaint . . . 2

        1. The Parties  . . . . . . . . . . . . . . . . . . . 2

        2. The Predicate Acts . . . . . . . . . . . . . . . . 2

        Predicate Act 1: Bank Fraud in Obtaining Funds for
        Purchase of the Riding Center Property . . . . . . . 3

        Predicate Act 2: Wire Fraud in Obtaining Proceeds
        of CVLR's Insurance Policy  . . . . . . . . . . . . . 4

        Predicate Act 3: Wire Fraud and Bank Fraud in
        Obtaining Money for Purchase of Truck Owned by
        Crystal Rivers  . . . . . . . . . . . . . . . . . . . 4

        Predicate Act 4: Wire Fraud in Obtaining State Farm
        Auto Insurance Policy Benefits  . . . . . . . . . . . 6

        Predicate Act 5: Bank Fraud in Presenting Forged
        Check . . . . . . . . . . . . . . . . . . . . . . . . 7

        Predicate Act 6: Bank Fraud in Foreclosure of Karen
        Foster's Home . . . . . . . . . . . . . . . . . . . . 7

        3. Facts Relating to Vicki Marsh  . . . . . . . . . . 8

4. The Inter-Relationship of the Predicate Acts . . 10

B.    Facts Recited in Foster's Motion to Intervene . . . 13

C.    Facts Recited in Marsh's Motion to Intervene  . . . 13

D.    Facts Relating to Foster's Diligence in Pursuing Her
      Rights . . . . . . . . . . . . . . . . . . . . . . 17

E.    Facts Relating to Marsh's Diligence in Pursuing Her
      Rights . . . . . . . . . . . . . . . . . . . . . . 18

Summary of the Argument . . . . . . . . . . . . . . . . 19

Argument  . . . . . . . . . . . . . . . . . . . . . . . 20

Standard of Review  . . . . . . . . . . . . . . . . . . 20

Discussion of Issues  . . . . . . . . . . . . . . . . . 20

I.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED
      TO APPLY EQUITABLE TOLLING TO FOSTER'S CLAIM AND DENIED
      HER MOTION TO INTERVENE AS TIME-BARRED. . . . . . . . 20

      A.    THE DISTRICT COURT ERRED IN FINDING THAT FOSTER
            DID NOT ACT DILIGENTLY EVEN THOUGH SHE MADE NON-
            CONCLUSORY ALLEGATIONS THAT SHE DILIGENTLY PURSUED
            HER CLAIMS IN MULTIPLE PROCEEDINGS AND IN MULTIPLE
            COURTS, REQUESTED AN EVIDENTIARY HEARING, AND WAS
            DENIED THE RIGHT TO PRESENT EVIDENCE THAT SHE HAD
            DILIGENTLY PURSUED HER CLAIMS. . . . . . . . . . 20

      B.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN
            IT DENIED FOSTER'S MOTION TO INTERVENE ON THE
            GROUNDS THAT NO EXTRAORDINARY CIRCUMSTANCES
            PREVENTED HER FROM TIMELY FILING HER RICO CLAIM . . 26

II.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED
      TO APPLY EQUITABLE TOLLING TO MARSH'S CLAIM AND DENIED
      HER MOTION TO INTERVENE AS TIME-BARRED . . . . . . . . 30

      A.    THE DISTRICT COURT ERRED IN FINDING THAT MARSH
            DID NOT ACT DILIGENTLY WHEN SHE MADE NON-CONCLUSORY
            ALLEGATIONS THAT SHE DILIGENTLY PURSUED HER CLAIMS,
            INFORMED THE COURT THAT THE DOCUMENTATION OF HER
            EFFORTS TO PURSUE HER CLAIMS WOULD REQUIRE AN
            AN EVIDENTIARY HEARING, SHE REQUESTED A HEARING,
            AND WAS DENIED THE RIGHT TO PRESENT THE EVIDENCE
            THAT SHE HAD DILIGENTLY PURSUED HER CLAIMS, EVEN
            THOUGH SHE IS MENTALLY IMPAIRED WITH AUTISM . . . . 30

vi

B.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN
IT DENIED MARSH'S MOTION TO INTERVENE ON THE
GROUNDS THAT NO EXTRAORDINARY CIRCUMSTANCES
PREVENTED HER FROM TIMELY FILING HER RICO CLAIM . .   33

Conclusion  . . . . . . . . . . . . . . . . . . . . . .   36

Request for Oral Argument . . . . . . . . . . . . . . .   36

Certificate of Service  . . . . . . . . . . . . . . . .   37

Certificate of Compliance . . . . . . . . . . . . . . .   38

## TABLE OF AUTHORITIES

### Cases

Brown v. Parchester South Condominiums, 287 F.3d 58
(2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 31

Canales v. Sullivan, 936 F.2d 755 (2d Cir. 1991) . . . . . . 31

Chao v. Virginia Dep't of Trans., 291 F.3d 276
(4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 20

Escalante v. Huffman, No. 7:10CV00211, slip op.
(W.D. Va. July 26, 2011) . . . . . . . . . . . . . . . 25 n. 1

Evans v. Eaton Corp. Long Term Disability Plan,
514 F.3d 315 (4th Cir. 2008) . . . . . . . . 22, 25, 30, 33

Forbess v. Franke, 749 F.3d 837 (9th Cir. 2014) . . . . . . . 31

Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997) . . . . . . . . 22

Hanger v. Abbott, 72 U.S. (6 Wall.) 532 (1867) . . . . . 26, 28

Harris v. Hutchinson, 209 F.3d 325 (4th Cir. 2000) . . . 21, 24

Holland v. Florida, 560 U.S. 631 (2010) . . . . . . . 21, 24, 27

Kleher v. A.O. Smith Corp., 521 U.S. 179 (1997) . . . . . . . 20

Kuusk v. Holder, 732 F.3d 302 (4th Cir. 2013) . . . . . . . . 22

Mobasco Corp. v. Silver, 447 U.S. 807, 826 (1980) . . . . . . 35

Osborne v. United States, 165 F.2d 767 (2d Cir. 1947) . . 26, 28

Pace v. DiGuglielmo, 544 U.S. 408, 418 (2008) . . . . . . . . 21

Rotella v. Wood, 528 U.S. 549, 555 (2000) . . . . . . . . . . 20

Yeh v. Martel, 751 F.3d 1075 (9th Cir. 2014) . . . . . . . . 31

### RULES

Federal Rule of Civil Procedure 11(b)(2) . . . . . . . . . . 27

## BRIEF OF APPELLANT

COME NOW the appellants, by counsel, who hereby submit their Brief of Appellant. The appellants have moved this court to allow them to proceed in forma pauperis.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is the appeal of a final order from a District Court.

## STATEMENT OF ISSUES

Foster and Marsh had four years to bring a RICO conspiracy claim against Wynne. Another victim of Wynne's RICO conspiracy, CVLR, filed suit first, and the district court erroneously dismissed CVLR's case on the grounds that Wynne's RICO conspiracy did not meet RICO's continuity requirement. Foster's and Marsh's four years expired *after* CVLR's case was erroneously dismissed *but before* this Court of Appeals reversed the dismissal. Did the district court abuse its discretion by refusing to apply equitable tolling to their limitations period so they could intervene?

## STATEMENT OF THE CASE

On September 8, 2011, CVLR Performance Horses, Inc. ("CVLR") filed suit in district court against John L. Wynne and his closely held companies, 1650 Partners, L.L.C., Rivermont Consultants, Inc., The Rivermont Banking Company, Inc., among other defendants, alleging that Wynne and his companies violated the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962, 1964 (J.A. 3, Docket No. 1).

On April 2, 2012, the district court granted the defendants'

[1]

motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (J.A. 4, Docket No. 68).  CVLR appealed the dismissal of the case to this court, which, in Cases 12-1591 and 12-1787, reversed the district court's decision and remanded the case (J.A. 4, Docket No. 85).

After the case was remanded, the appellants here, Karen Foster and Vicki Marsh, filed motions to intervene in CVLR's case (J.A. 105, J.A. 115).  The district court denied the motions to intervene as time-barred (J.A. 158).  Foster and Marsh timely appealed to this court the order denying the motions to intervene (J.A. 159, J.A. 161).  This court consolidated the briefing of their appeals.

After these appeals were filed, CVLR settled its claims in the underlying case, and the case was dismissed as settled (J.A. 7, Docket No. 181).

STATEMENT OF FACTS

A. FACTS RECITED IN CVLR'S FIRST AMENDED COMPLAINT.

1. THE PARTIES

CVLR Performance Horses, Inc. ("CVLR") is a Virginia corporation with its principal place of business in Goode, Virginia (J.A. 9 ¶ 3).

John Wynne ("Wynne"), a retired banker, is the sole owner of Rivermont Consultants, Inc. (previously known as The Rivermont Banking Company, Inc.) (identified herein as "Rivermont") and 1650 Partners, L.L.C. ("1650 Partners") (J.A. 8-9 ¶¶ 2-6).

Wynne operated Rivermont as an unlicensed bank in violation

[2]

of Va.Code § 6.1-112(A), which prohibits a person or entity from holding itself out as a bank unless it is authorized to do so by the Commonwealth of Virginia (J.A. 10 f.n. 1).

### 2. THE PREDICATE ACTS

### PREDICATE ACT 1: BANK FRAUD IN OBTAINING FUNDS FOR PURCHASE OF THE RIDING CENTER PROPERTY

In late 2006, Crystal Rivers, President of CVLR, responded at the office of Wynne, the President of Rivermont, to an advertisement for rental of pasture land. Wynne represented to Rivers that Rivermont was a bank. Actually, Wynne was at that time incarcerated and on work-release, but Rivers did not know that. After many discussions, Wynne agreed, ostensibly on behalf of Rivermont, to finance the purchase of real estate and equipment for CVLR's business (J.A. 9 ¶ 10).

CVLR entered into a contract to purchase an equestrian center (J.A. 12 ¶ 18). Wynne committed bank fraud when he represented to Old Dominion National Bank (hereinafter "ODNB") that 1650 Partners (an entity owned by Wynne) had a contract to purchase the equestrian center at a time that he knew he did not have a contract to purchase the property, causing ODNB to fund the purchase of the riding center property by 1650 Partners, even though CVLR had a contract to purchase the property. As a result, Wynne obtained for 1650 Partners from ODNB through bank fraud $475,000.00 to purchase the riding center property (J.A. 34 ¶ 116).

After 1650 Partners purchased the riding center, Wynne duped CVLR into believing CVLR had purchased the riding center in

[3]

accordance with its contract, that Rivermont had financed CVLR's
purchase of the riding center property even though 1650 Partners
had purchased it, and he collected mortgage payments and
insurance payments from CVLR as if it owed Rivermont money, even
though CVLR did not owe Rivermont money (J.A. 35 ¶ 118).

### PREDICATE ACT 2: WIRE FRAUD IN OBTAINING PROCEEDS OF CVLR'S INSURANCE POLICY

CVLR, duped by Wynne into believing that it owned the riding
center, began operation of the equestrian center.  CVLR purchased
casualty insurance from American Bankers Insurance Company
("American Bankers") covering the riding center property, listing
ODNB as the loss payee (J.A. 14 ¶ 28).

In February 2008, wind damage occurred at the property.
CVLR filed an insurance claim with American Bankers, which
approved a payment of $38,000.00 (J.A. 14 ¶ 29), made payable
jointly to CVLR and ODNB (J.A. 15 ¶ 31).  Wynne represented,
through forged documents that he faxed to ODNB and to American
Bankers, that contractor Glen White had done the repair work
authorized by American Bankers.  The repair work was not done
(J.A. 15 ¶ 34).  As a result of Wynne's wire fraud, Wynne
obtained, and paid to Rivermont (which had no right to the
insurance money) $35,190.59 of the insurance proceeds (J.A. 17 ¶
37).

### PREDICATE ACT 3: WIRE FRAUD AND BANK FRAUD IN OBTAINING MONEY FOR PURCHASE OF TRUCK OWNED BY CRYSTAL RIVERS

On or about May 8, 2007, Wynne, acting through Rivermont,
agreed that Rivermont would finance Crystal Rivers' purchase of a

[4]

Ford F650 truck (J.A. 18 ¶ 40).

Rivers went to Battlefield Ford, executed a promissory note to pay the dealer the purchase price of $100,697.13 (not counting credit for trade-in and down payment, which reduced the balance due on delivery to $60,508.86), and a Ford F650 truck was titled in her name (J.A. 18 ¶¶ 40-43).

On May 21, 2007, Rivermont, Wynne, CVLR, and Rivers entered into a "Lease, Loan and Contract to Buy Agreement" whereby CVLR and Rivers agreed to pay 8 1/2% interest per annum on any money that CVLR borrowed from Wynne to buy equipment (J.A. 18 ¶ 44).

On June 18, 2007, Wynne, acting as Rivermont, faxed a letter to Battlefield Ford, an automobile retailer, stating that Rivermont would "wire" the funds to pay Rivers' note (J.A. 19 ¶ 46).

Even though Rivermont had represented to CVLR that it was a bank and would finance CVLR's purchase of equipment such as the truck, Rivermont was not a bank.  Rivermont applied for an automobile loan from BB&T to pay Battlefield Ford in the amount of $107,341.80, falsely stating the purchase price of the vehicle and falsely stating that Rivermont would be the owner of the vehicle.  Through its bank fraud, Rivermont obtained $107,341.80 from BB&T on false pretenses (J.A. 40 ¶ 129).  Rivermont committed wire fraud in the same transaction (J.A. 39 ¶ 128).

CVLR was damaged by Rivermont's bank fraud because it became obligated to pay Rivermont $11,458.80 in interest (pursuant to the May 21, 2007 ""Lease, Loan and Contract to Buy Agreement")

[5]

that it would not have had to pay if Rivermont had been a bank and loaned its own money at 8 1/2%.  Instead, CVLR was required to pay Rivermont's loan payments to BB&T and a 8 1/2% premium per annum to Rivermont (J.A. 15 ¶ 31) to keep BB&T from repossessing the truck, which CVLR needed for its business (J.A. 19 ¶ 47).

## PREDICATE ACT 4: WIRE FRAUD IN OBTAINING STATE FARM AUTO INSURANCE POLICY BENEFITS

Wynne, acting through Rivermont, obtained information about Crystal Rivers' auto insurance, which covered CVLR's vehicles.

On February 1, 2007, Wynne telephoned Margie Callahan, Rivers' auto insurance agent, and told her falsely that Rivers had authorized him to add Rivermont's 1999 Chevrolet Tahoe to Rivers' auto insurance policy (J.A. 15 ¶ 61).  Rivers first learned of Wynne's call to when Callahan told Rivers that State Farm could not provide Wynne's auto insurance because he had been convicted of a hit-and-run DUI and had been incarcerated prior to November 2006 (J.A. 23 ¶ 62).

On April 16, 2007, Wynne (without Rivers' knowledge or approval) called Callahan again and requested that State Farm "reinstate" insurance coverage for Rivermont's Tahoe.  Callahan approved the coverage, but State Farm's underwriting department CANCELED the coverage on May 2, 2007 because the Tahoe was owned by Rivermont, not State Farm's insured (Rivers) (J.A. 23 ¶ 64).  Wynne then called Callahan again and falsely claimed that Rivers was an employee of Rivermont (J.A. 23 ¶ 65), which caused Callahan to insure the Tahoe.

On October 9, 2007, Wynne's sixteen-year-old son totaled the

[6]

Tahoe. Wynne made a claim on Rivers' policy. The State Farm adjustor told Wynne that he would not pay the insurance proceeds to Wynne unless he proved that he owned Rivermont. Wynne faxed a forged 2007 Annual Report document to State Farm, showing that he was the President of Rivermont (in fact, Rivermont's 2007 Annual Report did not show that Wynne was the President of Rivermont) (J.A. 24 ¶ 68).

Through his wire fraud of falsely telling Margie Callahan that Rivers had authorized him to place Rivermont's vehicle on Rivers' insurance policy and by sending the forged Annual Report form to State Farm, Wynne obtained $10,630.00 in State Farm insurance proceeds from Rivers' policy (J.A. 24 ¶ 69).

PREDICATE ACT 5: BANK FRAUD IN PRESENTING FORGED CHECK

On October 1, 2008, Wynne forged Rivers' name on the back of 1650 Partners' Check (at that time, Rivers was a member of 1650 Partners) No. 1020 and obtained $3000.00 for himself from Old Dominion National Bank ("ODNB") (J.A. 24 ¶ 70).

PREDICATE ACT 6: BANK FRAUD IN FORECLOSURE OF KAREN FOSTER'S HOME

On February 5, 2010 Wynne submitted to ODNB a financial statement in support of his application for renewal of the $475,000.00 loan he received from ODNB to purchase the riding center property, plus a new loan of $25,000.00 (J.A. 47 ¶ 145).

Wynne falsely stated in the application that he owned a house at 2232 Ridgewood Drive, Lynchburg, with a value of $200,000" and "no mtg [mortgage]" (J.A. 25 ¶ 76). Wynne had obtained title to the Ridgewood Drive property by foreclosing on

[7]

Karen Foster, who Wynne alleged had borrowed money from him that was secured by a deed of trust on her house.  In fact, the property was subject to a Bank of America mortgage in the amount of $72,000.00. (J.A. 25 ¶ 75).

As a result of his bank fraud, Wynne obtained credit in the amount of $500,000.00 from ODNB.

### 3. FACTS RELATING TO VICKI MARSH.

CVLR's amended complaint alleged that "Wynne's conduct relating to Vicki Marsh is essential to understanding the relationship between the predicate acts" (J.A. 26 ¶ 81).

Vicki Marsh is a long-time resident of Abingdon, Virginia and friend of John Wynne.  Marsh owned an interest in a house on Pawley's Island, South Carolina (J.A. 26 ¶ 82).

In September 2006, while Marsh was house-sitting for Wynne (who was in jail) at his house in Lynchburg, Marsh while clearing a place for herself to sleep in Wynne's guest bedroom, saw a paper that described her property.  The paper also listed "16 horses."  Marsh later asked Wynne about the papers on the bed, and Wynne said "it was to start up Rivermont," "$60,000 was to help Karen out" and "to help the girl with the horses out."  At that time, Rivers had no relationship with Wynne except that she rented pasture from him and had pledged sixteen horses as security.  Upon information and belief (based upon Wynne's statement to Marsh) Wynne had conceived of a unified scheme to defraud Marsh, Foster, and Rivers (J.A. 26 ¶ 83).

On November 8, 2006, Wynne visited Marsh in Abingdon and

[8]

bought a $60,000.00 Certificate of Deposit at First Bank and Trust Company ("First Bank") in the name of Rivermont. Marsh opened a credit line which, upon information and belief, First Bank stated was granted because of the "influence" of Rivermont purchasing the Certificate of Deposit at First Bank. Wynne's purpose in having Marsh obtain the line of credit at First Bank was to bolster Marsh's credit score so that, with the temporary equity that he would create in her house at Pawley's Island, she could obtain a mortgage from another bank (J.A. 26-27 ¶ 84).

On March 2, 2007, Marsh conveyed a one-half interest in her Pawley's Island property to Wynne. Shortly thereafter, Wynne paid approximately $450,000.00 to a South Carolina court as settlement of the partition dispute with Marsh's co-owners. Wynne obtained the funds by borrowing the money from a bank whose identity the plaintiff does not yet know (plaintiff knows that Wynne borrowed the money because he stated this is in an April 10, 2010 letter to Marsh) (J.A. 27 ¶ 85).

On March 30, 2007, Wachovia loaned Marsh $501,461.75, secured by her property (half of which, by the time of the closing, had been conveyed to Wynne). Marsh earns only $7000 per year and has no means of repaying the loan. The proceeds of the loan were paid to Wynne and he made all the payment on the loan until he stopped making payments in September 2008. Wynne was never added as a borrower on the Wachovia mortgage even though he received the proceeds of the loan and obtained a half-interest in Marsh's property, however (J.A. 27 ¶ 86).

[9]

Wynne listed his interest in the Pawley's Island house in the financial statement he provided to Darnell on October 12, 2007 when he sought financing from ODNB to purchase the riding center property.  He listed the market value of the house as "$1000K" (one million dollars) (J.A. 27 ¶ 87).

Wynne paid Marsh's Wachovia mortgage payments until September 2008 and made no mortgage payments after that date.  On a Saturday afternoon in September 2008 (Marsh cannot remember exact date), Wynne t632old Marsh that he was going to let Wachovia foreclose, buy the property on a short-sale from Wachovia, and that she is [expletive deleted] out of luck" (J.A. 27 ¶ 88).

CVLR's amended complaint alleged that, upon information and belief at that time, Wynne attempted to persuade Wells Fargo Bank,which owns the Marsh Note, to allow him to purchase the property at foreclosure for less than Marsh owes on the note (J.A. 28 ¶ 90).

### 4. THE INTER-RELATIONSHIP OF THE PREDICATE ACTS.

The money Wynne obtained through Rivermont and 1650 Partners was intermingled and the proceeds of Wynne's transactions with one victim were used by Wynne to finance transactions with the other victims (J.A. 30 ¶ 101).

CVLR's amended complaint cited three examples of inter-relationship between the victims.  It alleged that "for example" on July 23, 2008, Old Dominion National Bank issued Cashier's Check No. 1438 to Terrance White for payment of a false invoice

[10]

submitted by Wynne (who represented himself by forgery as contractor Glen White) for work done by contractor Glenn White (who is unrelated to Terrance White) to repair the damaged barn at the riding center property.  White endorsed the check "for deposit only" to "Rivermont Banking #6401620," but deposited the check into Wynne's personal checking account at Bank of the James numbered 641620.  With the funds from the insurance proceeds (intermingled with other funds from Rivermont and 1650 Partners), Wynne then paid Bank of the James Account 6401620 Check No. 966 to now-disbarred attorney Peter Sackett in the amount of $16,000.00 to pay the deposit on Wynne's purchase of Karen Foster's property at the foreclosure sale Sackett conducted on September 25, 2008.  Wynne wrote "2232 Ridgewood," the address of Foster's property, on the memo line of the check (J.A. 30 ¶ 102).

Another example is that on April 20, 2007 Wynne issued to Counts Realty Group a starter check on First Bank & Trust Co. (Abingdon, Virginia) Account No. 70002555 in the amount of $20,000.00 to pay the deposit on the riding center property which CVLR had a contract to purchase.  The check, which has "The Rivermont Banking Company" typed out, is an account which contains proceeds of the March 30, 2007 Wachovia straw-man loan obtained by Wynne using Marsh's credit (J.A. 31 ¶ 103).

A third example is that Crystal Rivers was shown, by Special Agent James E. Vaughan of the Virginia State Police, records of deposits into the Bank of the James Account No. 1120246 entitled "Southgate Leigh Wynne Trust" that matched the amounts of

[11]

cashier's checks that CVLR paid to ODNB for what she thought was her mortgage payment to ODNB.  Wynne paid Vicki Marsh's Wachovia note from the same "Southgate Leigh Wynne Trust" account, as established, for example by Check 904, dated May 28, 2007, in the amount of $3493.95.  Although Check 904 was paid by Wynne to Wachovia prior to CVLR's commencement of payments that were deposited into the "Southgate Leigh Wynne Trust" account, Wynne stated separately in a response to a complaint Marsh filed with Wells Fargo that he paid the Marsh mortgage from the "Southgate Leigh Wynne Trust" account through August 14, 2008.  Thus, the Marsh mortgage was paid with funds from CVLR's putative mortgage payments (J.A. 31 ¶ 104).

Wynne used the equity in real estate that he obtained from his victims to increase the appearance of his net worth so that he could obtain new financing (J.A. 31 ¶ 105).  For example, in April 2009, 1650 Partners applied to ODNB to renew the financing of the riding center property.  In the loan presentation made by Charles Darnell of ODNB as "Loan Officer" on April 23, 2009 to the ODNB committee, Darnell relied on Wynne's false statement to the bank that he "owned a vacation home in Pawley's Island, SC valued at $1,300K mortgage (owns 50%) . . . ." (J.A. 31 ¶ 106).

In an attempt to obtain financing from ODNB for a proposed "Ivy Lake" Waterfront Condominium Project in Forest, Virginia, Wynne submitted a personal financial statement "As of December 31, 2009," in which he listed as an asset: "1/2 Residential Property, 392 Myrtle Ave Pawleys Island South Carolina . . . I

[12]

own 1/2 but not on any debt so value represents my equity interest."  Wynne also listed "2232 Ridgewood," Karen Foster's property, as an asset, with a market value of $200,000.00 and a loan balance of zero, even though Wynne and Sackett had not yet paid off Bank of America's first mortgage on the property (J.A. 32 ¶ 107).

### B. FACTS RECITED IN FOSTER'S MOTION TO INTERVENE.

Foster adopted the above-stated facts in her motion to intervene.  She also stated the following additional facts.

In early 2006, Foster, a Class A contractor based in Lynchburg, Virginia, sought real estate financing from Rivermont. Since Rivermont was called the "The Rivermont Banking Company," Foster thought Rivermont was a bank (J.A. 108 ¶ 7).

On August 23, 2006, Wynne, acting through Rivermont, obtained a Deed of Trust and Note from Karen Foster on the pretext that he would loan her money $40,000.00 on that date. The debt was secured by her home.  The Deed of Trust was not a "Credit Line Deed of Trust" (J.A. 109 ¶ 9).

Wynne did not loan Foster the money prior to Foster making the Deed of Trust, but first recorded the Deed of Trust in the Circuit Court of the City of Lynchburg and then did not loan the money (J.A. 109 ¶ 9).

On September 25, 2008, now-disbarred attorney Peter Sackett, acting for Wynne, conducted a putative foreclosure sale of Foster's property at 2232 Ridgewood Drive.  Wynne bid-in the property for $40,000.00 (J.A. 109 ¶ 10).

[13]

Wynne knew there was a Bank of America mortgage on the property because he inquired about the balance of the loan at the local Bank of America Bank (J.A. 109 ¶ 11).

Bank of America held the first deed of trust on the property, but Sackett did not pay Bank of America from the proceeds of the foreclosure sale. Sackett spent the proceeds of the foreclosure sale for other purposes. After Sackett had spent the foreclosure proceeds, Wynne paid Sackett $72,000.00 from the Southgate Leigh Wynne Trust to pay Bank of America, which received the funds on January 12, 2010 (J.A. 109 ¶ 12).

The fact that Wynne foreclosed on the property, but was not owed money by Foster on the note that secured the Deed of Trust, was concealed by Wynne's fraud. Ms. Foster filed Chapter 7 Case No. 07-61731 on September 14, 2007. Andrew S. Goldstein was appointed Trustee in the case. On April 3, 2008, Wynne filed a letter with the bankruptcy court clerk, and faxed a copy to Mr. Goldstein, purporting to be a Proof of Claim in Case No. 07-61731. The letter stated: "I am submitting a Proof of Claim supported by an itemization of charges and a schedule of loans to [Ms. Foster] (underlining in original)." The letter claimed a "$40,000 note executed by Ms [sic] Foster secured by a recorded Deed of Trust on 2232 Ridgewood Drive. [sic] Lynchburg RE: schedule (A). Amount due $45,916.00." Wynne attached a document entitled "Schedule A" that showed that Wynne charged Foster 8% interest from August 23, 2006, and showed a total claim of "$45,315," even though Wynne had not loaned Foster $40,000.00 on

[14]

August 23, 2006. Upon information and belief, Mr. Goldstein was misled by Wynne's fraudulent Proof of Claim into not pursuing a fraudulent conveyance claim even though he would have done so if he had not been misled by Wynne (J.A. 109 ¶ 13).

Wynne submitted a financial statement to Old Dominion National Bank ("ODNB"), seeking financing for a business venture. The financial statement listed as an asset of Wynne the property at 2232 Ridgewood Drive. Wynne stated that the property had a value of "$200,000" and a "no mtg [mortgage]" (J.A. 110 ¶ 14).

The financial statement said:

> This information and the information provided on all accompanying financial statements and schedules is provided for the purpose of obtaining credit for the Applicant(s) or for the purpose of Applicant(s) guaranteeing credit for others. Applicant(s) acknowledge that representations made in this Statement will be relied on by Creditor in its decision to grant such credit. This Statement is true and correct in every detail and accurately represents the financial condition of the Applicant(s) on the date given below (J.A. 110 ¶ 15).

Wynne signed the statement on April 23, 2009 (J.A. 110 ¶ 15).

At the time the financial statement was submitted to ODNB, it was false because the Bank of America note had not been paid and the deed of trust had not been released (J.A. 110 ¶ 16).

Wynne submitted the financial statement to support his application to renew 1650 Partners' $475,000.00 loan to purchase the riding center property and 1650 Partners' $25,000.00 working capital loan. The loan required renewal every year, with no fee to renew (J.A. 111 ¶ 17).

ODNB extended financing to Wynne based upon Wynne's false

[15]

financial statement according to the ODNB April 23, 2009 loan presentation prepared by Darnell (J.A. 111 ¶ 18).

Wynne's own accounting that shows that he did not loan Foster the $40,000.00 prior to, or on, August 23, 2006. Nevertheless, Wynne obtained an order from the Circuit Court of the City of Lynchburg authorizing him to take possession of Foster's home and, on or about June 1, 2012, Wynne evicted Foster from her home at 2232 Ridgewood Drive, Lynchburg, Virginia, completing his scheme, involving Rivermont, to fraudulently obtain Foster's property (J.A. 111 ¶ 19).

All of these acts were performed as part of the pattern of racketeering activity pursued by Wynne, using Rivermont, as described in the plaintiff CVLR's Second Amended Verified Complaint (J.A. 111 ¶ 20).

### C. FACTS RECITED IN MARSH'S MOTION TO INTERVENE.

Vicki Marsh's motion to intervene recited all the facts relating to Wynne's racketeering conspiracy that were in CVLR's amended complaint and Foster's motion to intervene. She also recited the following additional facts.

On or about March 30, 2007, obtained a straw-man loan from Wachovia Bank, using Marsh, an autistic person, as the straw-man (J.A. 118 ¶ 8).

Wynne obtained approximately $492,650.85 in the straw-man loan proceeds by wire fraud. Wachovia disbursed $492,650.85 to Gwin Law Offices, L.L.C.. Gwin Law Offices, L.L.C. forwarded the funds to John L. Wynne because Wynne telephoned Gwin's office and

[16]

told one of Gwin's assistants that Marsh had authorized Gwin to pay the proceeds to Wynne. Marsh had no knowledge of Wynne's telephone call to Gwin and did not authorize Gwin to pay Wynne. Ms. Marsh did not receive any of the disbursed funds (J.A. 118 ¶ 9).

Wynne remains in possession of the Wachovia loan proceeds (J.A. 118 ¶ 10) and used the funds to pursue a racketeering conspiracy involving his closely-held companies (J.A. 118 ¶ 11).

### D. FACTS RELATING TO FOSTER'S DILIGENCE IN PURSUING HER RIGHTS.

Foster diligently asserted that Wynne had no right to foreclose on her house because he did not make the loan of money that he claimed was secured by the deed of trust. Foster filed Chapter 7 Bankruptcy Case No. 07-61731 on September 14, 2007, which stayed Wynne from foreclosing on her property and which allowed her to obtain a discharge of any money debt owed to Wynne. During that case, on April 3, 2008, Wynne submitted a fraudulent claim to the bankruptcy court (J.A. 163).

After the bankruptcy was discharged, Wynne employed now-disbarred attorney Peter Sackett to conduct a foreclosure sale of Foster's home. Foster filed Case No. 08-002958 on September 24, 2008 in Lynchburg City Circuit Court in an attempt to enjoin the foreclosure. A hearing was held on September 24, 2008, where Foster argued that Wynne did not loan her the money that would have been secured by the deed of trust. The court did not enjoin the sale, but told Sackett to provide evidence to Foster of the amounts loaned and the dates, but Sackett did not do so. Sackett

[17]

proceeded with the foreclosure sale (J.A. 163).

Wynne then sought to evict Foster from her home, and filed an unlawful detainer action against Foster in Lynchburg City Circuit Court (J.A. 164). Foster filed a counter-claim (Case No. CL10005362, Lynchburg City Circuit Court), which alleged that the foreclosure sale was a sham because Wynne and Sackett agreed that the $114,000.00 payment to Sackett was a gift or loan, given to Sackett to conduct an otherwise bogus sale (J.A. 164).

Foster filed Chapter 11 Case No. 12-60619, which stayed the Lynchburg City cases between Wynne and Foster. In that case, she stated on her bankruptcy schedules that she had a RICO claim against Wynne. Foster removed the Lynchburg cases to Bankruptcy Court, but the court declined to exercise jurisdiction and remanded the cases. Wynne filed a motion for relief from the automatic stay, which the Bankruptcy Court granted on May 22, 2012. Foster appealed that decision to the district court (Case Nos. 6:12-cv-00030, 31, and 32), and moved for a stay pending appeal. Wynne obtained an order from the Lynchburg Circuit Court on May 23, 2012 authorizing him to take possession of Foster's home (J.A. 164).

Later, the district court affirmed the Bankruptcy Court decision on the grounds lifting the automatic stay (J.A. 164).

### E. FACTS RELATING TO MARSH'S DILIGENCE IN PURSUING HER RIGHTS.

Marsh repeatedly, and continuously, throughout the period from September 2008 through the present, complained to the

[18]

federal and state criminal authorities, to the banking regulatory
agencies responsible for regulating Wells Fargo's business, and
to the courts of South Carolina that Wynne had injured her by
obtaining a straw man mortgage loan from Wachovia secured by her
house in Pawley's Island, fraudulently obtaining the loan
proceeds by falsely telling attorney Robert Gwin that she had
authorized Gwin to pay the loan proceeds to her, and then by
refusing after September 2008 to repay the loan, which caused
Wells Fargo (Wachovia's successor) to commence foreclosure, which
has jeopardized her ownership of her house (J.A. 151).

Marsh stated to the district court:

> The volume of complaints, letters, and court documents
> is too voluminous to include as an attachment to this
> reply.  Marsh requests that this Court hold a hearing
> so that she can present live testimony as to the
> actions she took to pursue her remedies" (J.A. 152 n.
> 1).

### SUMMARY OF THE ARGUMENT

The district court abused its discretion when it did not
apply equitable tolling to extend Foster's and Marsh's
limitations period so they could intervene into CVLR's case, or
even hold an evidentiary hearing to determine the extent of their
diligence.  Extraordinary circumstances prevented Foster's and
Marsh's timely intervention because the district court
erroneously dismissed CVLR's case _after_ their limitations period
expired but _before_ this court reversed the dismissal.  They were
diligent in pursuing their rights, and pleaded non-conclusory
allegations that they were diligent, but the district court

[19]

jumped to the conclusion that they were not diligent without holding an evidentiary hearing, even though Marsh is mentally impaired.   The district court's ruling had two negative effects: it effectively shortened Foster's and Marsh's limitations period from four years to three-and-a-half years, and it has allowed Wynne to benefit from the erroneous dismissal of CVLR's case by shutting out Foster and Marsh as intervenors, when they could have intervened if the district court had not erroneously dismissed the case.

## ARGUMENT

### STANDARD OF REVIEW

This Court reviews a district court's decision to deny equitable tolling (outside the habeas corpus context) under the abuse of discretion standard. Chao v. Virginia Dep't of Trans., 291 F.3d 276, 279-80 (4th Cir. 2002).

### DISCUSSION OF ISSUES

I.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO APPLY EQUITABLE TOLLING TO FOSTER'S CLAIM AND DENIED HER MOTION TO INTERVENE AS TIME-BARRED.

   A.    THE DISTRICT COURT ERRED IN FINDING THAT FOSTER DID NOT ACT DILIGENTLY EVEN THOUGH SHE MADE NON-CONCLUSORY ALLEGATIONS THAT SHE DILIGENTLY PURSUED HER CLAIMS IN MULTIPLE PROCEEDINGS AND IN MULTIPLE COURTS, REQUESTED AN EVIDENTIARY HEARING, AND WAS DENIED THE RIGHT TO PRESENT EVIDENCE THAT SHE HAD DILIGENTLY PURSUED HER CLAIMS.

The district court abused its discretion when it found that Foster did not act diligently to pursue her rights when she pursued her claims in multiple proceedings and in multiple courts, and the court denied her an evidentiary hearing.

[20]

The statute of limitations applicable to private RICO suits is four years, which runs from the date the plaintiff discovered, or should have discovered, the injury. Kleher v. A.O. Smith Corp., 521 U.S. 179, 183 (1997); Rotella v. Wood, 528 U.S. 549, 555 (2000).

Equitable tolling may extend the limitations period beyond four years in appropriate circumstances.  In Holland v. Florida, 560 U.S. 631 (2010), a case involving a federal habeas corpus petition, the Supreme Court wrote that it had previously held in Pace v. DiGuglielmo, 544 U.S. 408, 418 (2008), that a "petitioner" is "entitled to equitable tolling" only if he shows: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing. 560 U.S. at 649.  The Court held that per se rules as to what constitutes extraordinary circumstances are too rigid, and that cases must be evaluated individually. Id. at 651.

The Holland court held that the district court applied a too-strict standard of diligence: "The diligence required for equitable tolling purposes is 'reasonable diligence,' . . . not 'maximum feasible diligence.'" Id. at 653. The Court remanded the case with instructions that the Court of Appeals consider whether "further proceedings, including an evidentiary hearing, might indicate that respondent should prevail." Id. at 654.

In Harris v. Hutchinson, 209 F.3d 325 (4th Cir. 2000), a pre-Holland case, this Court described when equitable tolling is

[21]

available.  This Court held that equitable tolling is a
discretionary doctrine that depends on the facts of the
particular case.  Equitable tolling is not subject to "bright-
line rules."  The Court wrote that:

> The doctrine has been applied in "two generally
> distinct kinds of situations.  In the first, the
> plaintiffs were prevented from asserting their claims
> by some kind of wrongful conduct on the part of the
> defendant.  In the second, extraordinary circumstances
> beyond plaintiff's control make it impossible to file
> the claims on time.

Id. at 330 (citations omitted).  See also Kuusk v. Holder, 732
F.3d 302 (4th Cir. 2013)(discussing equitable tolling in the
context of a Board of Immigration Appeals case).

The Fourth Circuit examined the meaning of the "abuse of
discretion" standard of review in Evans v. Eaton Corp. Long Term
Disability Plan, 514 F.3d 315 (4th Cir. 2008).  The court wrote
that:

> It is notoriously difficult to venture a general
> definition of the term "abuse of discretion," and none
> is canonical . . . . The language "in-bounds" and "out-
> of-bounds" thus becomes all but irresistable in the
> abuse of discretion context, for the standard draws a
> line--or rather, demarcates a region--between the
> unsupportable and the merely mistaken, between the
> legal error, disorder of reason, severe lapse of
> judgment, and procedural failure that a reviewing court
> may always correct, and the simple disagreement that,
> on this standard, it may not. . . . At its immovable
> core, the abuse of discretion standard requires a
> reviewing court to show enough deference to a primary
> decision-maker's judgment that the court does not
> reverse merely because it would have come to a
> different conclusion.  The "deference that is the
> hallmark of abuse-of-discretion review," Gen. Elec. Co.
> v. Joiner, 522 U.S. 136, 143, 118 S.Ct. 412, 139
> L.Ed.2d 508 (1997), is deference enough to appreciate
> reasonable disagreement.

Id. at 321-22.

[22]

Under these principles, the district court abused its discretion to deny Foster the benefit of equitable tolling. The court did not state any grounds for its conclusion that Foster did not act diligently. The court cherry-picked Foster's claim that she "diligently asserted that Wynne had no right to foreclose on her house," and erroneously concluded that Foster had done nothing more to assert her claims against Wynne other than challenging the foreclosure, even though she had pleaded that she pursued multiple cases against Wynne in Lynchburg City Circuit Court, and in her Chapter 11 bankruptcy case, even listing her planned RICO case against Wynne in her Chapter 11 bankruptcy schedules. Despite that, the court stated only that it found that even though Foster "has done more than offer conclusory statements, she had "not met the very high bar of diligence required to invoke the doctrine of equitable tolling" (J.A. 244).

This mischaracterized Foster's pleading. She pleaded that she continuously asserted in court that Wynne had no right to foreclose on her house because he did not make the loan of money that he claimed was secured by the deed of trust in her Chapter 7 bankruptcy case, in multiple cases in Lynchburg City Circuit Court, and in her Chapter 11 bankruptcy case. She pursued multiple and extensive proceedings against Wynne, in multiple courts, regarding the injuries she suffered from Wynne's illegal foreclosure of her home based on the false pretext that she owed him money that she did not owe, prior to gaining an understanding

[23]

that she was injured as part of Wynne's multi-victim RICO conspiracy.[1]  The district court itself found that Foster's claim of diligence constituted more than conclusory allegations.

A close examination of her motion to intervene shows that, before her RICO limitations period expired, in March 2012, she said in her Chapter 11 bankruptcy schedules that she intended to file a RICO case against Wynne.  Shortly thereafter, on April 2, 2012, the district court erroneously dismissed CVLR's RICO case against Wynne on the grounds that Wynne's conspiracy did not last long enough to meet RICO's continuity requirement.  At that point, she was precluded from asserting the RICO claim because it had been declared to be invalid.  Later, in July 2013, this Court reversed the district court's dismissal of the RICO claim.  But Foster's four-year limitations period had expired.  She then filed her motion to intervene and requested equitable tolling.

Moreover, she requested in writing that the district court "hold a hearing to hear evidence relating to this motion, particularly regarding her diligence in pursuing her claims and the issues that were litigated in state court" (J.A. 171).  The court did not hold an evidentiary hearing to allow Foster to present evidence of the diligence she exercised in asserting her

---

[1]  The district court also misapplied the law by concluding that Foster was not diligent because she "waited towards the end of the limitations period before filing anything related to a RICO claim."  This finding is inscrutable and, on its face, erroneous because it implies that Foster filed her RICO claim within the limitations period.  If so, she was within her rights to wait to file her RICO claim towards the end of the limitations period; she was entitled to the full limitations period allowed by law.

[24]

claim.   Instead, the court merely asserted, _ipse dixit_ and wrongly, that Foster had not been diligent in asserting her claim prior to the expiration of the limitations period.

The district court abused its discretion to allow equitable tolling because it misapplied the principles of _Holland_ and _Harris_ in making its discretionary decision regarding equitable tolling.   _Holland_ requires only that the person seeking to invoke equitable tolling "has been pursuing his rights diligently," by "reasonable diligence," and not by "maximum feasible diligence." Moreover, the Supreme Court wrote that "an evidentiary hearing" is appropriate to determine whether the actions taken by the party constitute reasonable diligence.   Here, the district court denied Foster the right to present evidence as to her diligence and merely jumped to the erroneous conclusion that she had not been diligent because she had been involved only in "a foreclosure action."

Moreover, the court's reasoning that Foster did not act with diligence because she "waited for more than three and a half years before filing any RICO claim" (J.A. 245).   She had four years to file her claim under the applicable limitations period. The court's finding that she did not act diligently to pursue a claim prior to the expiration of the limitations period is an abuse of discretion because it has the effect of shortening her limitations period from four years to three-and-a-half years,

[25]

without any explanation or justification.[2]

The district court's action is an abuse of discretion of the type described in this court's Evans decision.  It was out-of-bounds because it had the effect of shortening Foster's time for bringing her RICO action from four years to three-and-a-half years.

The district court abused its discretion because its discretionary decision was based upon a misapplication of the applicable legal standard, when it denied Foster's motion to intervene on the grounds that it was untimely without allowing her the requested evidentiary hearing, even though she pleaded sufficient facts that, if true, would have supported her claim of diligence and when the court's decision had the effect of shortening her limitations period from four years to three-and-a-half years.

---

[2]  The district court misapplied Escalante v. Huffman, No. 7:10CV00211, slip op. (W.D. Va. July 26, 2011)(Magistrate Judge's report).  There, a prisoner did not timely file an action under 42 U.S.C. § 1983 because, he claimed, the prison library had an out-dated law book that stated the limitations period was three years, not two years.  He intentionally waited, for strategic reasons, until the end of the incorrect three-year period to file his claim.  Id. at 16.  The facts of Escalante are not comparable to the facts here: Foster pursued her claims in court throughout the limitations period, she stated in bankruptcy documents filed prior to the dismissal of the underlying RICO case and prior to the expiration of her limitations period that she intended to pursue her RICO claim, she had more than six months left on her limitations period when the district court erroneously dismissed the underlying case, she moved to intervene upon the reinstatement of the case by this Court, and she did not make a strategic decision to wait until after the limitations period had expired.

[26]

### B.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED FOSTER'S MOTION TO INTERVENE ON THE GROUNDS THAT NO EXTRAORDINARY CIRCUMSTANCES PREVENTED HER FROM TIMELY FILING HER RICO CLAIM.

The district court abused its discretion when it denied Foster's motion to intervene because the court's own erroneous decision, dismissing the case into which Foster sought to intervene, prevented her from filing her own RICO case.

As stated above, the Supreme Court held in Holland that a party is "entitled to equitable tolling" only if she shows she diligently pursued her rights, and "that some extraordinary circumstance stood in his way." 560 U.S. at 632.

Courts have consistently held that an extraordinary circumstance exists when the courts are closed during wartime or when a party is prevented by wartime circumstances from reaching the court. Hanger v. Abbott, 72 U.S. (6 Wall.) 532 (1867)(court closed during Civil War); Osborne v. United States, 165 F.2d 767 (2d Cir. 1947)(plaintiff held in Japan during World War II).

In Hanger, for example, the Supreme Court wrote tolling was justified because "the right to sue was suspended by the acts of the government, for which all citizens are responsible." 72 U.S. at 542.

These old precedents are consistent with the more modern precedent of Holland, which held that there can be no bright-line test as to what constitutes an extraordinary circumstance, but such circumstances exist; the Supreme Court held that even attorney misconduct of the type that the Eleventh Circuit held can never be an extraordinary circumstance may sometimes be an

[27]

extraordinary circumstance, depending on the case.

Federal Rule of Civil Procedure 11 subjects to sanctions an attorney or an unrepresented party from filing a pleading, or pursuing an action, that is not "warranted by existing law." Fed. R. Civ. Pro. 11(b)(2).

Here, the district court abused its discretion when it denied Foster's motion to intervene because the court itself created the bar to Foster's timely intervention in the CVLR suit. The court's erroneous dismissal of CVLR's RICO case on the grounds that Wynne's RICO conspiracy did not meet RICO's continuity requirement was itself the extraordinary circumstance preventing Foster from filing her own RICO case after the dismissal, shutting the courthouse door to her intervention. Foster could not have filed suit against Wynne on her own after the district court ruled that Wynne's RICO conspiracy did not meet the continuity requirement because she would have been subject to Rule 11 sanctions for asserting a RICO claim against Wynne, when the court had already held (erroneously) that Wynne's conduct did not meet RICO's continuity requirement.

Ironically, the district court justified its finding that Foster did not face an extraordinary circumstance by stating that Foster's circumstances were not as extraordinary as those faced by the plaintiffs in Hanger and Osborne because the court remained open to Foster. However, the court did not remain open to Foster's RICO claim against Wynne. If Foster had filed her own RICO claim (and she would have had to file it in the same

[28]

court because she lived in Lynchburg) during the time that the case stood dismissed, she and her attorney would have been subject to sanctions for filing a case stating a claim that the court had already rejected.  Therefore, the court was essentially closed to her, regarding her RICO claim against Wynne, during the period that the case stood dismissed.  The alternative explanation, that she should have filed anyway, is also legally defective, because Rule 11 essentially prohibits the filing of pleadings that are unwarranted by "existing" law and factually wrong, because neither an attorney nor Foster, personally, can be said to have access to the courts and also be subject to sanction for accessing the courts.

The district court itself "agree[d] that the dismissal and subsequent appeal produced a difficult circumstance for the parties seeking to intervene" (J.A. 179).  In fact, it was more than a difficult circumstance: it created a bar to the courthouse door that was just as severe as the closure of the courts during the Civil War and World War II.  It was an extraordinary circumstance that justified equitable tolling.

Perversely, if equitable tolling is not applied here, Wynne will benefit from the district court's erroneous decision, because the decision cut off early Foster's limitations period, even though the district court's decision in favor of Wynne was erroneous and was reversed by this court.

Moreover, the district court's comment that "Plaintiff provided no case law or any support for the suggestion that the

[29]

dismissal and appeal was one of those exceptional cases" (J.A. 179) supports Foster's claim that her circumstances were extraordinary.  There are no other reported cases like hers because the circumstances of this case, which were created by the district court itself, are so extraordinary.

Thus, Foster was prohibited from filing her RICO action prior to the expiration of the limitations period.  Under normal circumstances, Foster had until September 25, 2012 to bring her RICO claim.  She intended to do so, as evidence by the fact that she listed a RICO claim against Wynne on her March 22, 2012 bankruptcy schedules.  However, when this Court dismissed this case on April 1, 2012, Foster acted in the only way she could, by not bringing her RICO claim until after the Court of Appeals held that the RICO claim against Wynne should not have been dismissed.

Once the Court of Appeals reinstated this case, Foster sought to intervene and, if equitable tolling was applied, her RICO claim would have been timely-filed.

The district court's action is an abuse of discretion of the type described in this court's Evans decision.  It was out-of-bounds because it had the effect of shutting the courthouse door to her during the period that CVLR's case against Wynne stood dismissed on the erroneous grounds that Wynne's racketeering conspiracy did not meet RICO's continuity requirement, and then refusing to open the door to let her in once this court reversed the district court's erroneous dismissal of CVLR's case against Wynne.

[30]

The district court abused its discretion by denying the motion to intervene based upon an erroneous legal conclusion that these circumstances were not sufficiently extraordinary, when, in fact, the standard of "extraordinary" circumstances in the precedents were met: Foster was put in a position, entirely outside her control, which prevented her from filing within the limitations period.

II.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO APPLY EQUITABLE TOLLING TO MARSH'S CLAIM AND DENIED HER MOTION TO INTERVENE AS TIME-BARRED.

    A.   THE DISTRICT COURT ERRED IN FINDING THAT MARSH DID NOT ACT DILIGENTLY WHEN SHE MADE NON-CONCLUSORY ALLEGATIONS THAT SHE DILIGENTLY PURSUED HER CLAIMS, INFORMED THE COURT THAT THE DOCUMENTATION OF HER EFFORTS TO PURSUE HER CLAIMS WOULD REQUIRE AN AN EVIDENTIARY HEARING, SHE REQUESTED A HEARING, AND WAS DENIED THE RIGHT TO PRESENT THE EVIDENCE THAT SHE HAD DILIGENTLY PURSUED HER CLAIMS, EVEN THOUGH SHE IS MENTALLY IMPAIRED WITH AUTISM.

The legal principles and precedents cited above is just as applicable to Marsh's case as to Foster's.

However, an additional body of precedents applies to the diligence issue regarding Marsh.  Since Holland, when the Supreme Court remanded the case to the Eleventh Circuit with an admonition that an evidentiary hearing may be warranted, the Ninth Circuit has joined the Second Circuit in holding that evidentiary hearings are justified when a person subject to a mental impairment seeks to invoke equitable tolling.  For example, in Forbess v. Franke, 749 F.3d 837 (9th Cir. 2014), the Ninth Circuit reversed the district court and held that the petitioner was entitled to equitable tolling because his severe

[31]

mental delusions prevented him from filing in a timely manner.
The Court of Appeals had a well-developed record to review
because the district court gave the petitioner an opportunity to
present live testimony and submit supplemental exhibits before a
magistrate judge to support his equitable tolling argument. But
see Yeh v. Martel, 751 F.3d 1075 (9th Cir. 2014)(panel majority
did not remand for evidentiary hearing; dissent argued that
remand for evidentiary hearing was necessary under Forbess).  The
Second Circuit had already required evidentiary hearings when a
party seeking to invoke equitable tolling claimed mental
impairment. Canales v. Sullivan, 936 F.2d 755 (2d Cir. 1991);
Brown v. Parchester South Condominiums, 287 F.3d 58 (2d Cir.
2002).

The district court abused its discretion when it declined to
apply equitable tolling to Marsh's case on the grounds she did
not act with reasonable diligence to pursue her rights.

Marsh, even in the view of the district court, offered more
than conclusory statements about the actions that she took to
diligently pursue her rights.  In particular, Marsh pleaded that
she:

> repeatedly, and continuously, throughout the period
> from September 2008 through the present, complained to
> the federal and state criminal authorities, to the
> banking regulatory agencies responsible for regulating
> Wells Fargo's business, and to the courts of South
> Carolina that Wynne had injured her by obtaining a
> straw man mortgage loan from Wachovia secured by her
> house in Pawley's Island, fraudulently obtaining the
> loan proceeds by falsely telling attorney Robert Gwin
> that she had authorized Gwin to pay the loan proceeds
> to her, and then by refusing after September 2008 to
> repay the loan, which caused Wells Fargo (Wachovia's

[32]

successor) to commence foreclosure, which has
jeopardized her ownership of her house. (J.A. 151-52).

She pleaded that:

The volume of complaints, letters, and court documents
is too voluminous to include as an attachment to this
reply.  Marsh requests that this Court hold a hearing
so that she can present live testimony as to the
actions she took to pursue her remedies. (J.A. 152 n.
1).

Marsh claimed in her motion to intervene that she was "an
autistic person" (J.A. 119).  Nevertheless, the district court
denied her an evidentiary hearing, even though it was justified
by multiple factors: her non-conclusory allegations that could be
supported by live testimony, the large volume of documents, and
her mental impairment.

The court could not have known the extent of her diligence
or of her mental impairment.  It could not have known whether her
mental impairment was a factor that should have excused her late
intervention, especially in the extraordinary circumstances of
this case, where the district court erroneously dismissed the
case and this court reversed and remanded.

Moreover, the sole basis for the district court's conclusion
that Marsh did not act diligently was the fact that she "waited
towards the end of the limitations period before filing anything
related to a RICO claim" (J.A. 245).  As argued above as to
Foster, the court's reasoning that Marsh did not act with
diligence because she "waited for more than three and a half
years before filing any RICO claim," is specious.  She had four
years to file her claim under the applicable limitations period.

[33]

The court's finding that she did not act diligently to pursue a claim prior to the expiration of the limitations period is an abuse of discretion because it has the effect of shortening her limitations period from four years to three-and-a-half years, without any explanation or justification.

As with Foster, the district court's action is an abuse of discretion under this court's <u>Evans</u> standard.  It was out-of-bounds because it shortening her limitations period from four years to three-and-a-half years, which was beyond the district court's discretion.

The district court abused its discretion because its discretionary decision was based upon a misapplication of the applicable legal standard, when it denied Marsh's motion to intervene on the grounds that it was untimely without allowing her the requested evidentiary hearing, even though she pleaded sufficient facts that, if true, would have supported her claim of diligence, when she claimed mental impairment, and when the court's decision had the effect of shortening her limitations period from four years to three-and-a-half years.

<u>B.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED MARSH'S MOTION TO INTERVENE ON THE GROUNDS THAT NO EXTRAORDINARY CIRCUMSTANCES PREVENTED HER FROM TIMELY FILING HER RICO CLAIM.</u>

The district court abused its discretion when it denied Marsh's motion to intervene because the court's own erroneous decision, dismissing the case into which Marsh sought to intervene, prevented her from filing her own RICO case.

The legal principles stated in Section I(B) above apply to

[34]

Marsh's case, as well as to Foster's.

Like Foster, Marsh was prohibited from filing her RICO
action prior to the expiration of her limitations period. Under
normal circumstances, Marsh had until at least September 1, 2012
to bring her RICO claim. However, when this Court dismissed this
case on April 2, 2012, Marsh acted in the only way she could,
without being exposed to sanctions, by not bringing her RICO
claim until after the Court of Appeals held that the RICO claim
against Wynne should not have been dismissed. Once the Court of
Appeals reinstated this case, Marsh sought to intervene and, if
equitable tolling was applied, her RICO claim would have been
timely-filed.

As is also true regarding Foster, the district court abused
its discretion by denying Marsh's motion to intervene based upon
the erroneous legal conclusion that these circumstances did not
meet the standard of "extraordinary" circumstances in the
precedents when, in fact, Marsh was put in precisely the position
of the persons to whom courts previously allowed equitable
tolling: she was placed in circumstances, entirely outside her
control, which prevented her from filing within the limitations
period. The district court's exercise of discretion was out-of-
bounds because it shortened the RICO limitations period
applicable to Ms. Marsh, which was beyond the district court's
discretion.

The district court concluded its opinion by invoking the
Supreme Court's dicta in Mobasco Corp. v. Silver, 447 U.S. 807,

[35]

826 (1980) that "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." This reasoning is too simplistic. Several procedural rules interact here: there was a four-year statute of limitations, the district court incorrectly dismissed the case under Federal Rule of Civil Procedure 12(b)(6) prior to the running of the limitations period for potential intervenors, the intervenors could have been sanctioned under Rule 11 if they had filed their own cases while the limitations period was running and prior to the appellate decision on the dismissal, this court did not decide the case until after the intervenors' limitations period has expired, and the district court then refused to apply the long-accepted doctrine of equitable tolling to allow intervention. Even though the evenhanded administration of justice is best served by applying the applicable procedural rules, the aphorism is turned on its head when the applicable rules are not harmonized, but cherry-picked to shut the courthouse doors to even those parties whose claims were clearly identified and asserted prior to the running of the limitations period.

The district court's denial of the appellants' intervention motions in this case has allowed Wynne to benefit from the erroneous district court 12(b)(6) dismissal ruling by shutting out the intervenors Foster and Marsh, even though the dismissal decision was later reversed, and they would have been able to

[36]

intervene if the district court had not made the erroneous ruling in the first place.  The result here was not "evenhanded," but was patently unfair, and the district court's denial of the intervention motions should be reversed.

## CONCLUSION

The district court abused its discretion when it did not apply equitable tolling to extend Foster's and Marsh's limitations period, or even hold an evidentiary hearing to determine the extent of their diligence.  The district court's ruling had two negative effects: it effectively shortened Foster and Marsh's limitations period from four years to three-and-a-half years and it has allowed Wynne to benefit from the erroneous dismissal of CVLR's case by shutting out Foster and Marsh as intervenors, when they could have intervened if the district court had not erroneously dismissed the case.

This court should find that extraordinary circumstances prevented Foster's and Marsh's timely intervention, reverse the district court's ruling denying intervention, and remand the case with instructions that the district court should hold an evidentiary hearing to determine whether Foster and Marsh were diligent in pursuing their rights.

## REQUEST FOR ORAL ARGUMENT

The appellant requests oral argument.  Oral argument should be held because this appeal presents for first impression the issue of whether an intervenor should be entitled to equitable tolling when her limitations period expired _after_ the underlying

[37]

case was erroneously dismissed *but before* the Court of Appeals reversed the dismissal. The appeal also presents the issue of whether this court agrees with the Ninth and Second circuits that a mentally impaired party who seeks to invoke equitable tolling is entitled to an evidentiary hearing as to their diligence in pursuing their rights.

> Respectfully Submitted,
>
> KAREN FOSTER
>
> VICKI MARSH
>
> By: /s/ GARY M. BOWMAN

Gary M. Bowman, Esq.
VAB No. 28866
204 S. Jefferson St., 12th Floor
Roanoke, Virginia 24011
Telephone: (540) 343-7949
Fax: (540) 344-6144

## CERTIFICATE OF SERVICE

I, Gary M. Bowman, do hereby certify that a true and correct copies of this Brief of Appellant was mailed to Chad A. Mooney, Esq., Petty Livingston, 725 Church Street, Lynchburg, Virginia 24504 on July 28, 2014.

> /s/GARY M. BOWMAN

[38]

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-1021      **Caption:** FOSTER, et al., v. WYNNE, et al.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [✓] this brief contains ____9499____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [✓] this brief uses a monospaced typeface and contains ____1072____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ ] this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; or

    [✓] this brief has been prepared in a monospaced typeface using ____WORDPERFECT FOR DOS 6.0____ [*identify word processing program*] in ____COURIER 12____ [*identify font size and type style*].

(s) /s/ GARY M. BOWMAN _____

Attorney for KAREN FOSTER, VICKI MARSH

Dated: 7/28/2014 _____

38